1934-52 Lamar Wright v. City of Euclid, Ohio, et al. Oral argument not to exceed 15 minutes per side. Ms. Green for the Plaintiff Appellant. Thank you. Good morning. May it please the Court, my name is Jacqueline Green and along with Attorney Sarah Gelsomino we represent Lamar Wright, the Plaintiff Appellant in this case. Judge Clay, I'd like to reserve four minutes for rebuttal please. All right. Thank you. We are here today to discuss the District Court's decision to grant summary judgment in favor of defendants Kyle Flagg, Vashon Williams, and the City of Euclid. This is a de novo review and we're here concerning Plaintiff Appellant's claims of Flagg's and Williams' use of excessive force against Lamar Wright while they extracted him from his vehicle. Two, his false arrest. Three, malicious prosecution. And four, the extended detention that they caused. We're also here to discuss the District Court's decision to summarily dismiss Mr. Wright's Monell claim against the City of Euclid without examining the evidence supporting our contention that the City of Euclid was the moving force behind these violations. The City of Euclid's Police Department is a department with a number of bad apples, of which Kyle Flagg is one, and the department has a track record of disinterest in investigating or disciplining officers and a chief who thinks it's appropriate for officer training on use of force to include so-called breaks in humor with skits about police violence against black people. It's in this context that on November 4, 2016, defendants Kyle Flagg and Vashon Williams followed and then assaulted Mr. Wright. Flagg with his hands in a taser and Williams with O.C. spray. And then they arrested him, charged him with crimes he did not commit, and caused him to experience an extended detention and to face prosecution for several months before all of the charges against him were finally dismissed. This case boils down to disputed facts about, one, what happened at the East 207th Street house leading up to the point that Flagg and Williams got out of their car to approach Lamar Wright later on East 212th Street. What happened when the officers opened his car door, or rather actually Lamar voluntarily opened the door while complying with their orders, but the question there is did he resist? Did he comply? These are disputed facts. And third, did Flagg cause the extended detention? The district court's decision in this case cites undisputed facts as the basis for its decision in dismissing plaintiff's claims, but key facts stated in the court's decision are in fact disputed. And the court's legal conclusions flowed from those disputed facts. So in this case, the totality of the circumstances dictate that Flagg's and Williams' use of force against Lamar Wright was excessive, that they were without probable cause to arrest and prosecute him, and that Flagg caused Wright's extended detention. It's the role of the jury alone to weigh credibility, corroboration, and inferences in the process of finding facts. At the jury, not the district court must decide what actually happened and why it happened, and whether Lamar's rights under the U.S. Constitution and Ohio state law were violated. Appellant asks this court to reverse the district court's decision in its entirety. Now turning to the factual disputes in this case, our briefing outlines them in detail, but to address them briefly, when at the East 207th Street house, first of all, Flagg and Williams say there was no person visible. Of course, Lamar says his friend was sitting on the porch. They claim that Lamar pulled all the way up the drive to the back of the residence out of their view, and this is where they assume he engaged in some kind of drug transaction, except that Lamar was in plain sight. He said he did not pull all the way up the drive, and he spoke to his friend who was on the porch, and he remained in his car in plain view of the officers, obviously on the street side of the house. The officers were surveilling this house for drug transactions, is that correct? They were surveilling the house. However, when they both admitted that they had no idea whether they were surveilling based on old or still complaints, and also Williams had previously surveilled the house and had not seen any drug activity whatsoever at the house. That's what they knew, and that's what's important in the reasonableness analysis here. When you look at the complaint history in this case, there are only two complaints about potential drug trafficking at that location contained in the record. One of them is over a month and a half old, and the other one is over seven months old. They had no information, and certainly in terms of what they were watching, they both admit that they did not see any criminal activity. They did not see any drug transaction at that house, but the key is the dispute, right? They suspected the house was a place where drug dealing was occurring, and Mr. Wright pulled into the house in his car and had a discussion with the owner of the house. Is that correct? He pulled into the front of the house where he was in plain sight, not in the back of the house. The dispute here is key because they claimed they thought that there was a... What I'm getting at is your excessive force claim begins with the brandishing of the weapon. Is that correct? Yes. I'm focusing on that really at this point. What do the officers know going up to that point? They knew Mr. Wright had come from a house that they suspected of drug dealing. He had had an interaction with someone at the house. Is that correct? He'd had an interaction, but there was no transaction. Chris was on the porch. He was in his car. They talked about his recent surgery. Okay, but was there enough interaction that there could have been a transaction or drugs could have been given to Mr. Wright? No. Or they could have thought that drugs were given to Mr. Wright? No, because Mr. Wright remained in his car and Chris was on the porch. So how do you get drugs from a porch to a car? It was a long distance, so to speak, conversation. No one walked over to the car and leaned in or anything? Correct, yes. So that's the information they had starting out. There's also this information about the rental car issue, but they both admitted, Flagg and Williams, that they learned that later. Flagg says, well, we might have checked that after he left the house. Williams says, that we learned later in terms of the rental car issue. So as far as what they knew at the time, they just saw a guy in a car having a conversation with a guy on a porch about his surgery and his health, and then he left. And that was all. And the house he went to, it was Mr. Wright's house, was where he was stopped, correct? No, it was a friend's house in the neighborhood. Another house in the neighborhood? Yes. Okay. So they did not have any reasonable basis to believe that he was engaged in a drug transaction at that home. And then, of course, he leaves the house. He drives around the block, makes a couple turns. Of course, there are disputes there as well. He says he used his turn signal. The officers say he did not. And then they arrive at the second house at East 212th Street. Now, if they observed him not, if they believed he didn't use his turn signal, would that not give them reasonable suspicion to stop the car? Well, no. Obviously, a traffic infraction is what it is, but they repeatedly said this was not a traffic stop, number one. Number two, Flagg was very clear. They were going to stop that car as soon as they saw it at the first house. It was not based on the traffic stop, this decision to stop and search this vehicle. It was made before they knew anything about the rental. It was before the alleged traffic infractions. Of course, there are disputes about that. Now, at the house, of course, when they reach the vehicle, they walk up to the car. Lamar Wright immediately puts his hands up. Flagg says, you know, unlock the car. He opens the car door, unlocks the car door manually for him. He says, turn the car off. He turns the car off. He's completely compliant with Flagg's orders at this point. And then Flagg grabs his left hand, shoves him forward into the steering wheel, clearly causes him pain because he's saying repeatedly, you're hurting my arm, you're hurting my arm. And then, as we know, in the aftermath of this, he had had a surgery. It was hard for him to move. What the officers knew at the time was that, they both admitted, this was a tight space. It was hard to maneuver. It was going to be hard for Lamar Wright to get his right arm around to present it to the officers to be cuffed. And ultimately, he just can't move fast enough for them. And you can see in the videos, and I think these disputes are really important, because Flagg and Williams say that Lamar Wright pulled away from them. When you look at the videos, especially if you watch them in slow motion, that's not what you see. There's a lot in Flagg's body camera of black screen. You can't really see what's happening. But you do see Lamar Wright basically sitting there, twisting this way. In Williams' camera, when you look at it, especially if you slow it down, you see that Lamar Wright is sitting there. You see Flagg let go of his shoulder. There's no pulling away. There's no leaning. There's no lunging. There's no reaching also, by the way, as well, because Flagg has admitted he never saw any reaching. And Williams says the only reaching he saw was reaching toward the ignition or reaching toward the gear shift. Let me ask you now. Subsequently, your client says he moved his right hand or arm to put his cell phone in the cup holder, and the officer says he thought the movement of the right arm was to go for a gun. And so the question becomes, did the officer have a reasonable belief that Mr. Wright was going for a gun? How would you address those counter-arguments? There was no reasonable belief that he was going for a gun. One, there had been no indication whatsoever that he was armed. And secondly, Williams, who was on the passenger side, the reaching he described was to the ignition and the gear shift, and that's the only reaching he saw. And Flagg admitted in his deposition that he didn't actually see Lamar Wright reach anywhere. So there was no reaching going on. Lamar Wright ultimately was compliant with all of their commands. Of course, then they tased him, they O.C. sprayed him, caused him significant pain. And then the irony should not be lost on any of us that what they did at the end of the day was back away from the car and order him out of the vehicle without touching him, and he got out of the vehicle without being touched. And none of this force was necessary. It was all greater than necessary to effect the detention that they were attempting to put forth. What is their explanation for using the force? Well, they claimed that he was reaching for a gun, possibly. They claimed that they thought he was engaged in drug transactions and had drugs in the car. Of course, there was no contraband whatsoever in the vehicle. There was no weapon. There were no drugs. And Lamar Wright ultimately was a victim of excessive force, false arrest, malicious prosecution, and a prolonged detention for no reason whatsoever when all of the charges against him were dismissed. Is there any evidence of either of these officers having had excessive force claims against them in the past? Well, I'm glad you asked. Recently, after discovery was closed in this case, Channel 5 Cleveland did a deep investigation into use-of-force incidents in the city of Euclid, and out of 237 use-of-force forms that were completed by Euclid officers between about the middle of 2016 and the middle of 2018, which is the area surrounding this event, Flagg had completed the most use-of-force forms out of any officer in the entire department. He had 35 of those 237 reports. Now, in addition to that, there are a number of other incidents. We outlined in the brief the Richard Hubbard III case, the Eramis Spencer case, which happened around the same time, the Luke Stewart case with the decision from Judge Gwynn and the Northern District of Ohio. So there are a number of other incidents of force. And then in addition to that, there's the racism component, which we had admissions from Sergeant Mirowski that there had been open, overt racism in the department in the 90s, and that still continues today, not only in these specific cases that I just named and a number of others, but also one of their own officers just filed a lawsuit and actually has a trial set in March for allegations of racism within the department, racial slurs being used against him by his fellow officers. So this department has a significant pattern of excessive force problems and an ongoing custom, practice, culture, policy implicit, and I think explicit policies particularly contained in that defensive tactics training of overt racism and finding use of force to be a laughing matter. So for those reasons... I know your time's up, but just one question here. As to the training aspect of the training of the police with these cartoon characters seemingly making fun of citizens being brutalized by the officers, is there an issue as to whether these drawings that were used in the training were created prior to or after the incident involving your client? So the training did happen about two months or so after this event. However, obviously this training didn't just pop up out of the blue. The chief said that it was appropriate. He had no problem with this type of humor being used in his department for training, and that is not something that just happens one day when it didn't exist the day before. So it is our position that this just reflects and codifies and reduces the writing and images and skits that this particular department has policies implicit, explicit in this particular training and customs practices and ratification, all the like, of encouraging even excessive force and in particular against people of color. All right. You'll have your rebuttal time. Thank you. May it please the court. My name is Frank Scaldone. I represent the city of Euclid and the two individual officers in this case. We ask this court to affirm the trial court's decision granting summary judgment. The overarching theme in this case and what informs the district court's opinion is the notion that these types of situations must be viewed from the perspective of the officer on the scene and the understanding that officers must make split second decisions in rapidly evolving events. The overlay to this theme is our qualified immunity protections that we give to public officials and police officers. And there, as we know, qualified immunity protects officers unless they make a clear violation of clearly established law. The case law in this United States Supreme Court in here is it must be a knowing violation of the law or the officers have to be plainly incompetent. Respectfully, that just doesn't apply to this case and the scenario that presented these officers. Starting with the excessive force claim with regard to brandishing the firearm, the officers acted reasonably in evaluating that there could be a potential threat here. Here, they were assigned by their supervisor to surveil a suspected drug house. So they understand that when the plaintiff here goes to the house and spends one minute there and to allegedly visit a friend who he doesn't even know his last name. The officers did not have that first house under surveillance as a drug house. They followed Mr. Wright to the house. Is that right? And then when they were at the house, the officers thought that they remembered that that might be a house where drug trafficking might have been going on. But they didn't have the house under surveillance. They followed him to that location from the street. Is that what happened? No, that's not correct. They were surveilling the house that the plaintiff ultimately went to initially and spent one minute there and then left. Then after he left that scene, he was driving around and wound up at another house that wasn't his own residence and pulled into that area. So, but no, the house that he was spotted at is the same house that the supervisor expressly ordered them to surveil because of drug complaints. The part that I'm having the most difficulty with on excessive force is the use of the taser and the pepper spray. So would you focus on that? Because that seems to me the strongest argument they have for excessive force. Absolutely. I think, again, we have to look at what the officers were facing at the time they decided to use force. One, I mean, there is the backdrop, as we've discussed. There's the backdrop of the potential drug transaction at the house. And I think that there's a reasonable connection to believe that weapons are frequently used in drug-related activity. When the officers approached the car in the other house, the plaintiff immediately put the car in reverse, indicating that, giving a reasonable perception, that he either posed a threat to the officers or that he was trying to flee. Officer Williams was yelling at the plaintiff of a danger in the car because his hands were going down into the console and they didn't know whether he had a weapon. They could not see his right hand. Plaintiff, when they got into, when they ultimately got to, this is Officer Flagg, when they got to the side of the car and the door was open, Officer Flagg was able to get his left hand, the plaintiff's left hand. But here this is critical with regard to the right hand. And the plaintiff admits this. He was not providing his right hand. And at one point, he was able to break free or the officer lost his grip while holding onto his right shoulder. And at that point, Officer Flagg stepped back and made the split-second determination that he was going to use the taser. Now, at the same time, you have the use of the pepper spray, which also is one of the use-of-force claims that they have with Officer Williams. The information that he knew before he used the force was that, again, the plaintiff was involved in what appeared to be illegal drug activity and the connection between the possibility that there would be weapons involved. As Williams approached the rental car, which also, I might add, based on their training, is another indication that this would be a drug transaction. Wait a minute. I thought they only found out it was a rental car after the fact. At that time, they didn't know it was a rental car. I think the opposing counsel misapprehends the record in that the testimony is that at the house when he pulled up, at the house that is being suspected of drug transaction, at that time they did the search and found out that it was a rental vehicle. What is in the record regarding training of officers when dealing with suspects who are in cars? You know, there's the basic training. My understanding, and I apologize, I don't have it at the tip of my fingers, that there was discussion about training on that it was safer to be able to secure somebody who is in a car. The fear being that if they're out and they're not cuffed, there's more of a chance that they're going to flee. What about the use of pepper spray and tasering? Is there anything about that in the training that's in the record? There is, yes. There's the general policies and procedures that are part of the record in this case that I believe that they're even attached to the summary judgment motion practice. And is there any allegation by Mr. Wright that any of those policies were not followed with respect to these officers? I don't recall any, but I'm sure that there will be an argument that somehow they were violated. But I don't recall there being a specific argument made in the briefing that the policies were violated. But I guess perhaps a reason for that is we know that even a violation of a policy is not a violation of a constitutional right. And is there any allegation that there is any policy of use of pepper spray or tasering that in and of itself is unconstitutional or provokes excessive force? What I'm getting at is, is there a causal link between the alleged wrongful behavior of the officers to any particular policy of the city? None that I'm aware of. And this low-level use of force of both the taser and the pepper spray, when viewed in relation to the totality of the circumstances and the quick decision-making that needed to occur, it falls firmly within the constitutional rights of using this limited amount of force to obtain compliance or out of fear of the weapon, of a potential weapon. Counsel, I'm having trouble understanding why it was necessary for the officers to put hands on this man and to decide they needed to handcuff him and all that. He's in the driveway. They approach with guns drawn. They tell him to put his hands up, which he does. How did this stop, accelerate to the point that it was necessary to put their hands on this man and to want to handcuff him? What had he done to provoke all that? Again, I think the overarching theme is we're looking at the totality of the circumstances. And this goes back to not only the potential of him being involved in a drug transaction and the possibility of weapons. The fact that he put the car in reverse indicates that he's acting erratically or he's trying to flee or potential harm to the officers. The idea out of the driveway was to put the car in reverse and he didn't live there. So at some point he was going to put the car in reverse. What I'm getting at is what was it that made him at all suspicious other than the fact that he had stopped at a house that the officers suspected might have been a house where drug transactions occurred? That, of course, had never been adjudicated, but then he stops. If there was some suspicion, they could have questioned him, which they did do after the fact. But all of the tasering and pepper spray and all that, I'm trying to see what he did to... I looked at the video of the body count. I didn't see any threatening activity by the man that would provoke all that. And in answering your question, I'm trying to build what the... As we know in the Sixth Circuit, you have to evaluate all the totality of circumstances. And that goes up to the point where they did decide to use force. And those things are from everything from the suspicion of the drug transaction with the potentiality for weapons, the fact that he's put the car in reverse. And I might add that's the way you would get out of a driveway, but when police are asking... The suspicion of the drug transactions is what would have perhaps justified their questioning the man or approaching him, but all of the violence and the tasering and the pepper spray, all that which occurred pretty instantaneously, where did that come from? And again, to close the loop, it is happening very, very quickly. And the problem that's happening is when he's reversing, the police are calling out that they're police. Then you have the issue when he did take the car out of reverse, you have the issue of he's not responding to the officer's commands to show their hands or his hands are darting in toward the counsel or below the counsel of the car. They're concerned, again, going back to you've got a drug transaction, they're concerned for their welfare because you have the potential for weapons and you have a plaintiff who is not compliant. Now, when the use of force, when the door is open and the officer flag has got one of his arms,  they don't know where his right hand exactly is. What they do know, and the video I think indicates this, is that he's not giving them his right hand. And his hand is down where the counsel is. So they haven't identified what he's doing. They just know that he's not providing his hand and they're concerned for their welfare. When officer flag loses control of his right shoulder and he goes forward, he steps back and they make the instantaneous split-second decision to use force. Now, they're trying to handcuff him while he's still in the vehicle rather than having him exit the vehicle. At some point he's got to put his hand behind him to be handcuffed. I guess his thinking was he's putting down his cell phone so he could attempt to submit to the handcuffing. But why the handcuffing in the first place? They're not claiming that he attempted to use the vehicle to flee the scene. He's in reverse. That's their approach. He waits there. He doesn't continue in reverse or doesn't attempt to flee. He claims he puts his hands up. Why all the extreme behavior? The concern that there is a weapon to secure him at the scene. Again, they believe that that was the most prudent course of action to take. And while he may have believed that he had to put his hand down from the perspective of the officers, and what's clear in the video is that he's not giving his hand and he admits this. And he makes the claim that he's, and subsequently he says, I was reaching down to grab my phone or set my phone down. But still from the officer's perspective they have a quickly developing situation. They don't know if there's a weapon. They're not sure. So to handcuff him is to secure him for both their protection and I would assume that his protection as well. Unfortunately, they didn't know he had surgery. I mean, that's what his argument is. But that's something that wasn't in the knowledge of these officers. Let me ask you about the false arrest claim. What crime or crimes do you contend was the basis for probable cause? The basis for the probable cause is reasonable. You have the obstruction of just resisting arrest. And there you have the admission of the plaintiff. He admits it, that he failed to follow the officer's command and then pulled away from the officer. Just following, not following an officer's command alone. Is that enough to give you probable cause? For obstruction? Yes. I believe that it is, yes. With regard to the resisting arrest, he pulled away from the officers or appeared to pull away from the officers and resisted the restraint. You're talking about obstruction of official business? Yes. Are you aware of a recent decision, I just got it this morning, that talks about there has to be an affirmative act by the Sixth Circuit. There has to be an affirmative act by the victim or the defendant to create this obstruction. I'm not aware of that case, but the affirmative act here is him pulling away from the officers and the failing to follow the specific commands of the officers repeatedly. I think that that constitutes, either of those constitutes an affirmative act in this situation. Are you contending the failure to use the turn signal is one of the crimes for arrest? For the purposes of this, no, we're not. For the purposes of the summary judgment briefing and up on appeal, we are not, but we don't believe that's required for the determination on false arrest because the other two claims would justify that. As far as the malicious prosecution, I believe the Sixth Circuit has held, I believe it's the DiPiro v. Macedonia case, that traffic citations cannot form the basis for a federal malicious prosecution. Your contention is all they've done is they just issued citations? Is that all the officers did? That's correct. If it wasn't for the other issues in the case, there would be no detention. It would have been a citation and you would have been let go. All right, I believe you're out of time. Thank you very much for your consideration. I appreciate it. Thank you very much. Your rebuttal. I'd like you to focus on the Monell claim. I'm trying to get my mind around the causation analysis. What do you have to show as far as the link between your alleged unconstitutional policy and the actual conduct that these officers engaged in? Sure, so there is the option to provide pattern evidence, which we think we have around the training and the other incidents involving excessive force and the racism that's run rampant in the department for a long time. Now, in addition to that, of course, we could have single incident. You're not claiming any particular policy about tasing or use of pepper spray that is wrongful here? To the issue of specific policies in the manual for the officers, for example, what we actually have is a gap in policies. For example, how to make accommodations for people with physical limitations, no policy. When an officer can show or display a firearm, no policy. Handcuffing drivers inside their vehicles, no policy. Extracting people from vehicles. The use of O.C. spray. There is a policy about tasing and pepper spray, correct? There's one about tasing, not one about O.C. spray use, according to Flagg and Williams. And then in addition to that, there is no policy on the simultaneous. Are you saying that the officers did not follow the tasing policy? We're saying that there actually is no training on it and there are no policies on it. And this is the kind of gap where the failure to have a training program or a set of policies addressing these issues gives rise to potential problems that are so obvious that rights injuries were a highly predictable consequence of the failure to have those policies and that training. And also the simultaneous use of the O.C. spray and the taser. The officers admit that they would not have needed to use both to gain compliance here. So use of both is also a problem. So there are failures to have those things in general. Now in terms of the drug related activity contention, there are obviously disputes underlying what the officers saw that allegedly gave rise to the theory that he was engaged in drug transactions. But I would just posit that there's a guy sitting on a porch who might be attached to a house that might maybe have some drug activity going on and Lamar Wright just says hello. This kind of three degrees of separation situation, does that mean that any one of us who says hi to someone on the street who might have a connection to a connection to a connection of something can have police roll up on them with guns? That's absurd. There's no justification for that. In terms of the taser and O.C. spray issues you brought up earlier, here the big question is was he resisting, was he not? Lamar Wright has been clear throughout this entire situation. They were hurting him. He was trying to comply. They never gave him a chance to finish complying with their orders. But he was in the process of complying. He's clear. He never pulled away. And when you look at the videos, the parts that you can see, and of course there are parts that you can't see, but the parts that you can, there's no image of him pulling away. These are issues for the jury at the end of the day. And that's why we ask that this case be remanded and sent back. Lamar Wright deserves his chance to present his case to a jury. It's within the jury's province to weigh these competing inferences that one might draw from the facts here. It's not the role of the district court judge to make those determinations. Disputed facts underlie everything that happened here from the start to the end. FLEs in this case have failed to grapple with most of the disputed facts in this case. They keep asserting their own version of the facts, and that necessarily precludes summary judgment in their favor. The ones they have addressed, again, like I said, they just simply give rise to disputes. There are two different accounts here. The jury has to sort it out. Likewise, Mr. Wright deserves the chance to have a jury decide whether or not the City of Euclid's history of racism among its ranks, ongoing failures to discipline officers for excessive force incidents, no one can remember a time when that has ever happened in this department, along with the repugnant training which captured the EPD's culture and practices and implicit policies around use of force, in particular against black people. Lamar Wright should be allowed to have a jury determine if Euclid's the moving force here and encouraging its officers, including Flagon Williams, through so-called humor to exceed the constitutional limitations on the use of force. All of these questions are within the province of the jury, and for these reasons we ask this court to reverse in the entirety the district court's decision and to remand for trial. Thank you. There was one question I forgot to ask your opposing counsel about, and that is you've got a claim for extended detention. After your client posted bond, the police apparently did not release him. They held on to him and took him somewhere for a full body scan. Does the record show anything about the police explanation for why they felt entitled to retain custody of Mr. Wright after he posted bond? They claim that ultimately he was being shipped downtown to the county jail because he had a medical issue, except he posted bond, there's no reason to keep him, and obviously if he's not in their custody, they have no duty to provide medical care for him, and no one can explain why he was shipped downtown. The county jail people don't understand it. Euclid's people don't understand it. If the bond was posted, he should have been let out, and this just ties back into what happened at the hospital where they tried to force him to undergo a CAT scan to see if he had anything in his body, which of course the hospital legal told everybody, no, you can't do that. And then in addition, when he ultimately refused, they said, okay, now we're charging you, and then when he gets to the Euclid jail, he's told by a correctional officer, those two officers said that they want you to go through a machine, a body machine, they want to do a scan to see if you have anything in your body, and this is why he was being sent downtown even though his bond's been posted. I think that their explanation makes no sense. It's very clear that when you tie flags, designation of this case as a drug investigation, and his admission that he knew this would result in additional searches in the jail, coupled with what Lamar was told by the correctional officers, it's clear that flag caused this extended detention. Alright, thank you very much. Thank you so much. Take your arguments on both sides, and the case is submitted.